J-S15019-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.P.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.P.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1288 WDA 2020 |

Appeal from the Order Entered November 3, 2020
In the Court of Common Pleas of Allegheny County Orphans' Court
at No: CP-02-AP-0000046-2020

BEFORE: LAZARUS, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY MURRAY, J.: **FILED: JULY 26, 2021**

R.P.H. (Father) appeals from the order involuntarily terminating his parental rights to his son, R.P.H., born in August 2018.[1] Upon review, we affirm.

At the time of R.P.H.'s birth, Mother tested positive for opiates and alcohol. Orphans' Court Opinion, 1/19/21, at 6.[2] Upon discharge from the hospital on August 16, 2018, R.P.H. was placed in emergency custody with Allegheny County Office of Children, Youth and Families (CYF), due to Mother's

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The order also terminated the parental rights of E.J. (Mother), who did not appeal.

[2] We assigned numbers because the Orphans' Court opinion is not paginated.

substance abuse and domestic violence between her and Father.[3] *Id.* at 5-6. Following a hearing the next day, the court placed R.P.H. in shelter care. With respect to Father, the court found he was not an appropriate placement for R.P.H. because he did not acknowledge Mother's drug and alcohol issues. *Id.*

The court subsequently held an adjudication hearing, where, prior to the hearing being continued, Father appeared and told the CYF caseworker he was in agreement with R.P.H. remaining in foster care. N.T., 10/29/20, at 23-24. The court convened another hearing on October 10, 2018; Father did not appear and the court found R.P.H to be dependent. In furtherance of R.P.H.'s permanency goal of reunification, Father was to maintain contact with CYF, attend supervised visitation, complete drug and alcohol and domestic violence programs, and participate in mental health treatment. Orphans' Court Opinion, 1/19/21, at 6-7 (citing N.T., 10/29/20, at 22-27).

Father had no contact with CYF until March 11, 2020 — approximately 17 months later, and a week after CYF had petitioned for the involuntary termination of Father's parental rights. N.T., 10/29/20, at 24, 54. In the petition, CYF alleged grounds for termination under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). CYF specifically alleged that Father had failed to contact CYF or visit R.P.H. since October 2018.

---

[3] R.P.H.'s half-siblings, J.S. and O.S., were also removed from Mother's care on August 16, 2018; the three children reside in the same pre-adoptive home. N.T., 10/29/20, at 300.

The termination hearing occurred remotely, due to Covid-19, on October 29, 2020.[4] A child advocate represented the legal and best interests of R.P.H., who was two years old at the time.[5] CYF presented the testimony of its caseworkers, Nikole Ficorilli and Hannah Shankle, as well as expert witness Dr. Neil Rosenblum.

Father testified, and also presented testimony from Project Star specialist and visitation coach, Kirk Thoma, and senior facilitator for the Women's Center and Shelter Batterer's Intervention Program, George Fleming. Father stated he was not incarcerated at the time of R.P.H.'s adjudication in October of 2018. N.T., 10/29/20, at 269. He explained that in March or April of 2019, however, he was incarcerated for approximately three weeks, before being released on bond, due to a criminal charge involving domestic violence. *Id.* at 267, 270-271. Father's bond was revoked because he failed to appear for a court hearing. *Id.* at 271. In October 2019, Father surrendered to authorities with respect to the bond revocation, and was incarcerated until January 2020. *Id.* at 271-272. In February 2020, Father pled guilty to simple assault related to the 2019 domestic violence. *Id.* at 272-273. Father received a probationary sentence, which was pending at the

---

[4] The hearing included CYF's petitions for involuntary termination of Mother's parental rights to R.P.H., J.S., and O.S., and involuntary termination of the parental rights of S.S., the father of J.S. and O.S.

[5] J.S. and O.S. were represented by a different child advocate.

time of the termination hearing. *Id.* at 273. Father testified that his probation required that he obtain a drug and alcohol evaluation, and participate in a batterer's intervention program. *Id.* at 235. With respect to his probation terms, he stated: "Basically complete everything that I am also completing for CYF. They are pretty much running concurrent [*sic*] right now with each other." *Id.*

The child advocate for J.S. and O.S. presented the testimony of N.C., the "family friend" and foster mother to R.P.H., J.S., and O.S. Orphans' Court Opinion, 1/19/21, at 6. Mother also testified. At the conclusion of the hearing, the orphans' court stated its findings of fact and conclusions of law on the record. N.T., 10/29/20, at 322-340.

By order dated October 29, 2020 and docketed November 3, 2020, the court involuntarily terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). Father timely filed a notice of appeal and concise statement of errors complained of an appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court filed a Rule 1925(a) opinion.

Father raises the following issues for review:

1. Whether the [orphans'] court erred and/or abused its discretion as a matter of law in concluding that the necessary burden of proof was met, and that Father cannot or will not remedy conditions and causes of the incapacity, abuse, neglect, or refusal that caused [R.P.H.] to be without essential parental care, control, or subsistence necessary for his physical or mental well-being pursuant to [23] Pa.C.S. § 2511(a)(2)[?]

2. Whether the [orphans'] court erred and/or abused its discretion as a matter of law in concluding that the necessary burden of

- 4 -

proof was met, and that Father cannot or will not remedy conditions which led to the removal within a reasonable period of time and that termination of parental rights would best serve the needs and welfare of [R.P.H.] pursuant to 23 Pa.C.S. § 2511(a)(5)[?]

3. Whether the [orphans'] court erred and/or abused its discretion as a matter of law in concluding that the necessary burden of proof was met, and termination of parental rights would serve the needs and welfare of [R.P.H.] pursuant to 23 Pa.C.S. § 2511(a)(8)[?]

4. Whether the [orphans'] court erred and/or abused its discretion as a matter of law in concluding that the necessary burden of proof was met, and that the developmental, physical, and emotional needs and welfare of [R.P.H.] would be served by termination of parental rights pursuant to 23 Pa.C.S. § 2511(b)[?]

Father's Brief at 8-9.[6]

We review the orphans' court decision for an abuse of discretion. We have explained:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted).

---

[6] The child advocate filed an appellee brief in support of termination.

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, we find the record supports termination pursuant to Section 2511(a)(8) and (b), which provides:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. **With respect to any petition filed**

**pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition**.

23 Pa.C.S.A. § 2511(a)(8), (b) (emphasis added); *see also In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm).

This Court has explained, "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003). Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the child welfare agency supplied over a realistic time period. *Id.* The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement, or the availability or efficacy of the agency's services. *In Re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003). We have explained:

> [T]he application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems

that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re J.F.M.*, 71 A.3d 989, 997 (Pa. Super. 2013) (quoting *I.J.*, 972 A.2d at 11-12).

Finally, the court must consider whether termination best serves the child's needs and welfare. *In re Adoption of M.E.P.*, *supra* at 1275-1276. The "needs and welfare" analysis is relevant to both Sections 2511(a)(8) and (b). In *In re Adoption of C.L.G.*, 956 A.2d 999 (Pa. Super. 2008) (*en banc*), we stated,

> while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*Id.* at 1009 (citations omitted).

With respect to Section 2511(b), "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases

where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

On appeal, Father disregards procedural rules by failing to divide his argument into separate parts. Father's Brief at 10-14. Likewise, Father does not display particular points in the argument section of his brief. ***See*** Pa.R.A.P. 2119 (providing the "argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part -- in distinctive type or in type of distinctively displayed -- the particular point treated therein, followed by such discussion and citation of the parties as are deemed pertinent"). Pa.R.A.P. 2101 underscores the seriousness with which this Court views procedural rules, as it permits quashal or dismissal of an appeal for noncompliance. Here, Father presents four issues, but his singular and entire argument consists of five pages. Nonetheless, we consider Father's claims.

Father does not assert error or abuse of discretion by the court with respect to the first and second elements of Section 2511(a)(8), *i.e.*, that R.P.H. was removed from Father's care, and 12 months or more elapsed since removal. It is undisputed that R.P.H. was removed from Father's care on August 18, 2018, and more than two years had passed at the time of the termination hearing on October 29, 2020.

Likewise, Father does not assert error or abuse of discretion with respect to the third element — that the conditions which led to R.P.H.'s removal continue to exist. Father's argument is that "he has made substantial progress toward[] his goals," and he "can and will remedy conditions that led" to removal. Father's Brief at 14. Critically, he does not assert that the conditions which led to removal no longer exist.

With regard to the final element of Section 2511(a)(8), Father argues the court erred in determining that termination would best serve R.P.H's needs and welfare. *Id.* at 10. Father emphasizes recent success. He states he "achieved sobriety in July, 2019," then "resolved outstanding criminal matters," before "he reestablished contact" with CYF on March 11, 2021. *Id.* at 11. He references visitation with R.P.H., starting virtually on May 21, 2020, and in-person as of June 18, 2020. *Id.* Father states he has "engaged in coached parenting" with R.P.H. and has not missed a visit. *Id.* Father broadly claims he and R.P.H. "have an established relationship and bond that is positively progressing at a rapid pace." *Id.* at 14. Father further asserts that since March 11, 2020, he has maintained consistent contact with CYF, and was assessed for drug and alcohol concerns, with no further treatment recommended. In addition, he asserts he underwent a mental health evaluation and is receiving therapy, and attended 20 consecutive sessions in a batterer's intervention program, with four sessions left until completion. *Id.*

at 11. This evidence does not support a finding that the court erred or abused its discretion.

The record supports the court's conclusion that termination would best serve the needs and welfare of R.P.H. Notably, Father's efforts were initiated after CYF petitioned for termination petition. At the time of the termination hearing, Father was participating in in-person visits with R.P.H. twice per week for three months. N.T., 10/29/20, at 68. However, R.P.H.'s foster mother, N.C., testified on cross-examination by Father's counsel:

> Q. On days that he is not visiting his father, does [R.P.H.] ever mention his father, ask about his father, talk about his father?
>
> A. No.

*Id.* at 304. N.C. denied that R.P.H. looks forward to visits with Father. *Id.* at 303. She testified that after Father's visits, R.P.H. "is very wild. . . . He whines a lot, has a little bit of a temper, throws stuff around the house." *Id.*

Dr. Rosenblum performed an interactional evaluation of N.C. and R.P.H. on August 24, 2020, and Father and R.P.H. on August 27, 2020. Dr. Rosenblum testified, "There is no question [R.P.H.'s] primary attachment is to his foster mother. . . . I believe that it would be very stressful for [R.P.H.] to be removed from this placement or from the relationship that he has clearly relied on his entire life." *Id.* at 114. With respect to Father participating consistently in in-person visits twice weekly since July of 2020, Dr. Rosenblum opined:

Consistent visitations twice a week are less time than a child would spend with a teacher. [T]hat doesn't make him a father. Again, if he had started with two hours twice a week a year or two years ago, and was able to expand his visitation and have full-day unsupervised visitation and overnights, that would give him an opportunity to be a father. **Right now I would say he is a visitor, not someone who functions as a father or a caregiver**.

*Id.* at 132 (emphasis added).

On cross-examination by Father's counsel, Dr. Rosenblum stated that Father's involvement with the batterer's intervention program, his consistency with mental health therapy, and his consistency with coached visits with R.P.H. "would suggest that he has started to move in the right direction." *Id.* at 129. Dr. Rosenblum then testified:

Q. If he is involved in these groups, if he is doing this consistently, if that's the facts in this case, would we agree that he is taking some ownership of the issues we are concerned for?

A. I do not agree with that, no. You can lead a horse to water, that doesn't mean that they are going to drink. He may be taking those classes, but in my discussion with him and in the testing as well, it was an excessive admonishment of his responsibility or ownership for those difficulties.

*Id.* at 130.

Further, R.P.H. has special needs, although his diagnosis is unspecified. Hannah Shankle, the CYF caseworker since April 27, 2020, testified that R.P.H. receives early intervention services. *Id.* at 60, 90. He also receives nutritional services and occupational therapy. *Id.* at 90-91. The foster mother, N.C., testified she has taken R.P.H. to "numerous [medical] appointments." *Id.* at 293.

In addition, N.C. testified to knowing Father prior to R.P.H.'s dependency,[7] and that Father reached out to her about R.P.H. "[v]ery few times in the very beginning, and then he just kind of almost fell off the face of the earth and there was no contact whatsoever." *Id.* at 295. On cross-examination by R.P.H.'s child advocate, Father testified:

Q. When was the first time you made an affirmative action to reach out to either CYF or the foster mother about having a visit with your son?

A. An actual visit through CYF, the first time was this March [2020] about getting my visitation. That was the first time I was available after I was incarcerated.

Q. But all of 2018, most of 2019 you never messaged CYF or the foster mother about having a visit?

A. There wasn't much left of 2018. And 2018 and I believe maybe early 2019, I did go to a couple of doctor's appointments with [foster mother]. . . . We spoke on the phone about things.

*Id.* at 261.

The above evidence supports the court's finding that Father "admitted that throughout 2018 and 2019, during the times he was not incarcerated, he never reached out to anyone to set up any visits with [R.P.H.]. [N.T., 10/29/20,] at 261, 267. Father's pattern evidenced a lack of commitment to adequately parent [R.P.H.] and ignore[d] the time constraints to be a ready,

---

[7] N.C. testified that Father and her cousin are the parents of a nine-year-old daughter. N.T., 10/29/21, at 304. N.C. testified that the daughter visits her house "a lot," and "is a part of [R.P.H.]'s life." *Id.* at 305.

willing and able parent for a dependent child." Orphans' Court Opinion, 1/19/21, at 11. The court further explained:

> Father . . . demonstrated to the [c]ourt that he did not take the matter seriously as he was absent from any participation in the case from its inception in August 2018 until March 2020. Only then did he begin to show some participation; however, the time had passed for him to meaningfully participate in the services that CYF provided on his behalf.
>
> Father's failure to remedy the causes for dependency are a direct result of his delay in addressing his reunification goals and to meaningfully participate in the services offered by OCYF. … Testimony revealed that Father did not see his child for extended periods of time, because "he lost focus" and did not pursue visitation. (See OCYF Exhibit 1 - Permanency Review Order, 6/3/2020). … At the time of the [hearing], Father's visitation remained supervised.

*Id.* at 9-10. The record supports the trial court's factual findings and termination of Father's parental rights pursuant to Section 2511(a)(8).

Father also assails the court's needs and welfare decision under Section 2511(b). However, Father fails to support this claim by discussion and analysis of pertinent legal authority. Therefore, the issue is waived. ***See Giant Food Stores, LLC v. THF Silver Spring Development, L.P.***, 959 A.2d 438, 444 (Pa. Super. 2008) ("The Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority. Failure to do so constitutes waiver of the claim.") (citations and quotation marks omitted).

Nonetheless, in the absence waiver, the record supports the court's determination pursuant to Section 2511(b). The following case law is relevant:

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Court directed that in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The Court observed, "[c]hildren

- 15 -

are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Consistent with the evidence discussed above, there is no support for a finding that Father and R.P.H. share a parent-child bond. Rather, the record supports the court's conclusion that R.P.H. lacked a "necessary or serious" relationship with Father, and severance of the relationship would not "create undue harm or emotional setback." Orphans' Court Opinion, 1/19/21, at 24 (citing Dr. Rosenblum's testimony that the security and consistency of R.P.H.'s relationships with foster mother and his siblings "outweighs any connection" with Father). Therefore, the court did not err in finding that termination of Father's parental rights will serve the developmental, physical, and emotional needs and welfare of R.P.H.

For the above reasons, we affirm the order terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/26/2021

- 16 -